UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:19-CR-030-01 |
| | ) | JUDGE REEVES |
| ANTHONY EUGENE LONG | ) | |

PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of Tennessee, and the defendant, Anthony Eugene Long, and the defendant's attorney, Tim S. Moore, have agreed upon the following:

1. The defendant will plead guilty to the following counts in the superseding indictment:

a) Count One, that is, conspiracy to distribute 50 grams or more of methamphetamine, its salts, isomers and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A).

The punishment for this offense is as follows: a term of imprisonment of no less than ten years and up to life, a fine of up to $10,000,000.00, a term of supervised release of at least five years to life, and a mandatory assessment of $100.00.

b) Count Eleven, that is, conspiracy to transmit or transfer monetary instruments or funds knowing that the monetary instruments or funds were proceeds of an unlawful activity and with the intent to promote the carrying on of a specified unlawful activity (money laundering), in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(h).

The punishment for this offense is as follows: a term of imprisonment of not more than 20 years, a fine of $500,000 or twice the value of the monetary instruments involved in the

transfers, whichever is greater, a term of supervised release of not more than three years, and a mandatory assessment of $100.00.

2.	The defendant has read the superseding indictment, discussed the charges and possible defenses with defense counsel, and understands the crime charged. As to Count One, the defendant agrees that each of the following elements of the crime must be proven beyond a reasonable doubt: (1) An agreement to distribute methamphetamine; (2) knowledge and intent to join the conspiracy; (3) participation in the conspiracy, and (4) that the conspiracy involved 50 grams or more of methamphetamine. As to Count 11, the defendant agrees that each of the following elements of the crime must be proven beyond a reasonable doubt: The defendant (1) did combine, conspire, confederate, and agree with at least one other person to conduct and attempt to conduct a financial transaction affecting interstate commerce and/or foreign commerce; (2) that the defendant knowingly, intentionally, and without authority joined the conspiracy to conduct and attempt to conduct a financial transaction affecting interstate commerce or foreign commerce; (3) the defendant knew that the conspiracy involved a transaction involving the proceeds of some form of unlawful activity and that it in fact involved the proceeds of a specified unlawful activity; and (4) the defendant intended to participate and to further the conspiracy.

3.	In consideration of the defendant's guilty plea, the United States agrees to move the Court at the time of sentencing to dismiss the remaining counts against the defendant in this indictment.

4.	In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case.

Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

a) Through the testimony of numerous witnesses, the United States would demonstrate, beyond a reasonable doubt, that beginning approximately in October of 2016 and continuing to on or about March 12, 2019, in the Eastern District of Tennessee and elsewhere, the defendant did knowingly, intentionally, and without authority, conspire with at least one other person to distribute at least 4.5 kilograms of methamphetamine, a Schedule II controlled substance.

b) In early July of 2018, law enforcement officers with the Charlotte, North Carolina Police Department received information from a Confidential Source (CS) that the defendant was trafficking methamphetamine while staying in hotels in uptown Charlotte. The CS provided detectives with a phone number for the defendant and advised officers that he drove a blue four door Mini Cooper. On July 5, 2018, detectives, utilizing the CS, arranged for a controlled purchase of a quarter pound (4 oz.) of methamphetamine from the defendant for $2,200 at the Omni Hotel where the defendant was staying. When detectives arrived at the hotel, they were able to locate the blue Mini Cooper with a Tennessee license plate. The plate was registered to the defendant. Detectives then spoke with the hotel manager, who confirmed that the defendant was staying in room 1130. When the CS contacted the defendant to finalize the drug transaction, co-defendant Carden answered the phone instead (using the defendant's phone). Carden told the CS that the defendant was asleep at the time and to let him know when the CS arrived and he would meet the CS downstairs.

c) At approximately 7:15 p.m., the CS contacted the defendant's phone, which was again being used by Carden, and they arranged to meet in the lobby bar of the Omni Hotel.

Carden met the CS in the lobby bar and told the CS that the methamphetamine was in the hotel room. Carden and the CS went back up to the room and Carden granted consent to search the room to law enforcement. Once inside, detectives observed the defendant on a bed. Detectives also observed, in plain view, a pipe used to smoke methamphetamine and approximately four ounces of methamphetamine on the bedside table. A note on the methamphetamine package indicated that it was being sold for $2,200 to the CS (CS's name was written on it). Based on the items seen in plain view, detectives applied for a search warrant for the hotel room and the blue Mini Cooper registered to the defendant. A search of the room located approximately 125.8 grams of methamphetamine and the pipe used to smoke methamphetamine. Detectives also located a black backpack next to the bed the defendant had been lying on. A search of the backpack revealed approximately 629 grams of methamphetamine and a black, .22 caliber Jennings pistol. The firearm was loaded and there were 5 bullets in the magazine.

d)     Following the search of the hotel room, detectives went to the parking deck to execute the search on the defendant's vehicle. During the search of the vehicle, detectives located $9,000 inside the glove compartment. The manager of the hotel provided detectives with a copy of the hotel agreement for Room 1130, which showed the room had been rented to the defendant, with a phone number matching that which the CS had used to arrange for the purchase of methamphetamine. The information provided also reflected that there were two adults in the room to be rented. The credit card provided was also in the name of the defendant.

e)     Officers also obtained a search warrant to search the defendant's two phones. The following is a brief summary of some of the communications from the defendant's phones. On June 13, 2018, the defendant sent an instant message to a customer, "Yeah, if you ever need anything please don't hesitate to call. I always have and its always top shelf on all boards." In

other texts with the same individual, the defendant said he had gallon containers and there was discussion about, "When you get here what we'll do is exchange this outside inside the gate. So pull up to the gate and pull in once I open the gate." On May 27, 2018, a customer texted the defendant. "Hey are you in town I've got someone wanting some. And wants to know how much for a G". The defendant responded, "What is the amount?" The defendant later texted, "20 an ounce for g." In an instant message with another customer, the defendant texted, "I only ever have your best interest… and it hurts me to know our relationship is based off this drug because I don't want this for you but I know that without you won't be my friend anymore and that's sad. Also I gave you an ounce yesterday and my stead of my passport getting taken care of I lost 365 dollars. If you could please give me the money for the ounce I would appreciate it." The customer then texted, "Well, I'm off to rehab." The defendant responded, "Aw good luck!!!! Enjoy Palm Springs." On May 23, 2018, the defendant sent instant messages back and forth with another individual. The person told the defendant they needed to buy "at least a half zip of not a whole." The defendant told the person that he had a connect in Birmingham. The person asked, "What kind of sale is worth you driving to bham?" The defendant responded, "At least 2500 worth." On June 3, the other individual messaged the defendant, "I do have seven people interested in your visit to bham and becoming clients."

      f)     The phones also contained pictures of numerous deposits/money transfers, some as follows: an April 6, 2018 bank deposit in the amount of $8,000 cash, a May 3, 2018 bank deposit in the amount of $4,500 cash, an April 23, 2018 bank deposit in the amount of $6,480 cash and a May 26, 2018 deposit in the amount of $9,000 cash. Three different bank accounts were utilized to deposit money as were evidenced on the phones. Additionally, on March 29, 2018, the defendant's methamphetamine source of supply texted the defendant two separate

names, account numbers, banks and amounts to deposit money generated from methamphetamine sales: one in the amount of $7,000 and the other $9,000. On March 29, 2018, the source of supply also texted two different Wells Fargo bank addresses in Woodstock, Georgia for the purpose of the defendant depositing funds obtained from the sale of methamphetamine. The defendant admits that he conducted financial transaction(s) involving methamphetamine knowing that the cash involved in such transactions represented proceeds from the sale of methamphetamine - all with the intent to promote the continuing sale of methamphetamine.

       g)     One of the defendant's phones also showed the text communications between Carden and the CS leading up to the arrest in the hotel of the defendant and Carden. They are referenced as follows:

Carden: "Hey its Colton didn't mean to call was trying to say sorry and I'll have him call u as soon as he's up he's like dead ass asleep I've tried shaking him nothing."

CS: "No problem, I know he has been working a lot. I understand he's tired. Thank you Colton."

Carden: "Hey he's still asleep but I can meet you for him how much do you need?"

CS: "He said he'd do 4 for 2200, if not I'll just do 2 for the 1200."

Carden: He said he will do the 4 2200."

Carden: "Lmk when you're here he's asleep so thru me."

CS: Sounds good bro, I'll be there within an hour."

       h)     The defendant was charged in state court in North Carolina and made bond on the July 5, 2018 arrest. Then, on September 19, 2018, while on bond, officers with the Etowah Police Department, in the Eastern District of Tennessee, were dispatched to the Circle K Market

parking lot in reference to two individuals passed out in a blue Mini Cooper next to the air pump. When officers approached the vehicle, they observed two males asleep, as well as a white powder on the vent of the hood on the driver's side. Officers knocked on the vehicle window; the driver awoke and rolled down his window. The driver identified himself as co-defendant Lucas Davis. Davis agreed to step out of the vehicle and speak with officers. The defendant was the passenger in the vehicle. Davis denied having any firearms or illegal drugs on his person, but allowed officers to check. A search of the person of David revealed approximately seven grams of methamphetamine. A K-9 unit was called to the scene. Pending the K-9's arrival, the defendant decided to leave on foot and was permitted to do so by the officers, as he was not in custody. Upon arrival, the K-9 unit alerted on the driver's side rear door. The vehicle was searched and officers found 13 containers in the backseat in a brown leather bag containing methamphetamine. Officers also located one container in the front console containing methamphetamine. Numerous items of drug paraphernalia and scales were also found inside the vehicle. Overall, an approximate 2,400 grams of methamphetamine was located during the search of the vehicle. After finding the methamphetamine, officers went looking for the defendant. They found him within a short walking distance at a Hardees restaurant. The defendant was asked if he would step outside the Hardees. When the defendant walked outside and then was told to put his hands behind his back, the defendant took off on foot and fled from the officer. A foot chase ensued, but officers were unable to catch the defendant. The first part of the foot chase is captured on video until the officer fell too far behind the defendant.

     i)     On September 19, 2018, following his arrest, Davis gave a statement to law enforcement after having been advised of his *Miranda r*ights and executing a waiver. In that statement, Davis told agents that he had known the defendant for eight or ten months and that the

defendant was his "drug buddy." Davis stated that he would drive the defendant around to deliver methamphetamine in the Knoxville area and occasionally to Sevierville. Davis normally stayed in the vehicle while Long would go into various houses or other locations to deliver the methamphetamine. When asked how often he would drive the defendant around, Davis responded, "1st, 2nd, and 3rd shift…365/25/8." When asked to explain, Davis said that he was at the defendant's disposal whenever he was called upon to drive and it "occurred all the time." Davis admitted to law enforcement that he had purchased methamphetamine from the defendant, approximately 10 to 15 times; one to two grams at a time. Most of the time, the defendant gave Davis methamphetamine for driving him around. Davis stated that he drove the defendant to Atlanta, Georgia up to five times to pick up methamphetamine. When asked about the current trip to Atlanta, Davis stated that they left Knoxville Sunday night and that the defendant had $27,000.00 in cash when they left Knoxville. When they arrived in Atlanta, the defendant left the motel with his backpack that contained the $27,000.00 in cash and walked to meet with the source of supply to get the methamphetamine.

j)       The defendant again made bond on the September 19 arrest. Then, on September 26, 2018, the Knox County Sheriff's Office responded to 7223 Wellsley Manor Way, where he had been staying with another individual, in order to apprehend the defendant on an outstanding warrant. The defendant was taken into custody upon his arrival at the residence. There were two other occupants in the vehicle with him. A K-9 unit arrived on the scene and gave a positive alert to indicate the detection of narcotics. A search of the vehicle revealed a black bag in the back seat that contained glass pipes, digital scales, approximately $5,000 in cash bundled with different color rubber bands and 18 individual plastic zip baggies all containing large shards of methamphetamine. The total weight of the combined bags was approximately 1.1 pounds.

k)    The defendant was subsequently interviewed at the Knox County Sheriff's Office following his arrest after being fully advised of his *Miranda* rights and after executing a written waiver.  The defendant stated that he became involved with methamphetamine by the fall of 2016, at first by personal use.  He stated that he had seen his supplier with an amount of methamphetamine as big as a human head before (estimated approximately eight pounds).  After a period of time, the defendant agreed to assist his supplier in the distribution of methamphetamine, at least in part to pay off a sizeable drug debt owed by his supplier to his larger suppliers in Atlanta.  The defendant would go to Atlanta and pick up between one to three kilograms of methamphetamine per trip.  The defendant made these trips beginning in the fall of 2017 and leading up to his arrest.  The defendant admitted that his supplier had given him bank account numbers to deposit money that was owed for methamphetamine and that the defendant had, in fact, made those deposits.  Co-defendants Colton Carden and Lucas Davis had both gone with the defendant to Atlanta to obtain these kilogram quantities of methamphetamine for resale.  The defendant sold methamphetamine to one certain customer at the amount of an approximate ounce per week for about one year.  Co-defendant Lacy Bailey was also a methamphetamine customer of the defendant.  Bailey would similarly purchase an ounce of methamphetamine at a time.  Yet another customer, an unindicted co-conspirator purchased an approximate ounce of methamphetamine from the defendant every few days.

l)    The defendant again made bond on the state court charges, and returned to selling methamphetamine.  On November 27, 2018, officers with the Knox County Sheriff's Office, utilizing a confidential informant (CI), conducted a controlled purchase of methamphetamine from the defendant.  The buy took place where the defendant was living at that time, 4508 Greendale Road.  The CI was provided with $300 to purchase 15 grams of methamphetamine.

The transaction was monitored and recorded. The buy occurred within 1,000 feet of Shannondale Elementary School. A text message from the defendant leading up to the buy stated to the CI, "I have new beautiful amazing stuff..you are gonna be so happy!!"

m)      On November 30, 2018, officers with the Knox County Sheriff's Office Narcotics Unit executed a search warrant at the residence of the defendant at 4508 Greendale Rd. Upon executing the warrant, officers found both the defendant and a roommate in the bedroom. Also in the bedroom, officers located approximately 4.2 ounces of methamphetamine, scales, packaging material and a large sum of US currency. The cash and methamphetamine were located together inside a safe. The defendant was arrested again. The defendant again waived his *Miranda* rights and stated that the cartel gave him drugs to sell in order to fulfill a debt he owed them.

n)      Following the arrest of Long on November 30, 2018, the defendant made a number of phone calls recorded on the jail system. In one of the calls, the defendant instructed an unidentified female to tell an unindicted co-conspirator to go to "their spot away from the house" to retrieve the money in order to make his bond. Officers then went to the jail to confront the defendant with the call. He was again advised of his *Miranda* rights. He waived them and agreed to speak to officers. The defendant stated that there was a storage unit that contained more drugs and money. The defendant gave officers written consent to search the storage unit at 3890 Papermill Drive. During the search of the storage unit, officers seized approximately one pound of methamphetamine, approximately 10 grams of mushrooms, four sets of digital scales and packaging material. While officers were still on the scene, the unindicted co-conspirator (UIC) (who had been told to go get the money) arrived. The UIC was interviewed and told officers she had already taken the money back to her residence. She also acknowledged the

presence of two containers of methamphetamine inside the storage unit. She gave officers consent to go back to her residence and retrieve the money she had taken from the storage facility and officers did so. The UIC went with them, walked into her bedroom closet and retrieved a box of baggies that she used to conceal the illegal drug proceeds. In that box was a large sum of US currency that she surrendered to officers.

o) For the purposes of this plea agreement, the parties agree that a 2-level enhancement for possessing a firearm under §2D1.1(b)(1) should apply to this defendant.

p) The defendant agrees and stipulates that he conspired to distribute and is accountable for at least 4.5 kilograms of actual methamphetamine, a Schedule II controlled substance.

5. The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

a) the right to plead not guilty;

b) the right to a speedy and public trial by jury;

c) the right to assistance of counsel at trial;

d) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

e) the right to confront and cross-examine witnesses against the defendant;

f) the right to testify on one's own behalf, to present evidence in opposition to the charges and to compel the attendance of witnesses; and

g) the right not to testify and to have that choice not used against the defendant.

6.      The parties agree that the appropriate disposition of this case would be the following as to each count:

a)      The Court may impose any lawful term(s) of imprisonment, any lawful fine(s), and any lawful term(s) of supervised release up to the statutory maximum(s);

b)      The Court will impose special assessment fees as required by law; and

c)      The Court may order forfeiture as applicable and restitution as appropriate. No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea(s). The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

7.      Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting

responsibility for the defendant's offense(s), including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

8. The defendant agrees to pay the special assessment in this case prior to sentencing.

9. Unless otherwise limited by an agreed preliminary order of forfeiture, the defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, which are in the possession or control of the defendant or the defendant's nominees that were used and intended to be used in any manner or part to commit and to facilitate the commission of a violation of Title 21 United States Code Sections 846 and/or 841, and/or any and all assets and property, or portions thereof, subject to forfeiture as proceeds of the defendant's criminal activities which are in the possession or control of the defendant or the defendant's nominees. The defendant further agrees to assist the United States fully in the identification, recovery, and return to the United States of any other assets or portions thereof subject to forfeiture. The defendant further agrees to make a full and complete disclosure of all assets over which the defendant exercises control and those which are held or controlled by a nominee. The defendant agrees to forfeit all interests in the properties as described above and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and the signing of any other documents necessary to effectuate such transfers. The defendant agrees not to object to any civil or criminal forfeiture brought against these properties. The defendant

agrees to take all such steps to locate such property and to pass title to the United States before the defendant's sentencing.

10.    Financial Obligations.  The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court.  The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately.  If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution.  The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate.  The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel.  In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.  In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

a)    If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs.  The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

b) The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

c) If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant

11. The defendant acknowledges that the principal benefits to the United States of a plea agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by the United States in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offense(s) committed, the defendant voluntarily, knowingly, and intentionally agrees to the following:

a) The defendant will not file a direct appeal of the defendant's conviction(s) or sentence with one exception: The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

b) The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's conviction(s) or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

c)       The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. Section 552, or the Privacy Act of 1974, 5 U.S.C. Section 552a.

12.       This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this plea agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this plea agreement in any way (including but not limited to failing to enter guilty plea(s) as agreed herein, moving to withdraw guilty plea(s) after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea(s) in this case.

13.       The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

14. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charge(s), and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

J. DOUGLAS OVERBEY
UNITED STATES ATTORNEY

_12-16-19_  By: _____
Date          DONALD WAYNE TAYLOR
              Assistant United States Attorney

_12-12-19_    _____
Date          ANTHONY EUGENE LONG
              Defendant

_12-12-19_    _____
Date          TIM S. MOORE
              Attorney for the Defendant